UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| EDWARD SALOMON and ANNETTE SALOMON, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 2:10-CV-372-APR |
| CINCINNATI INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment [DE 44] filed by the plaintiffs, Annette Salomon and Edward Salomon, on January 31, 2013, the Motion for Summary Judgment [DE 47] filed by the defendant, Cincinnati Insurance Company, on January 31, 2013, and the Motion to Strike [DE 50] filed by the plaintiffs on February 27, 2013. For the following reasons, the Motion for Summary Judgment [DE 44] filed by the plaintiffs is **DENIED**; the Motion for Summary Judgment [DE 47] filed by Cincinnati Insurance is **GRANTED;** and the Motion to Strike [DE 50] is **DENIED.**

Background

The plaintiffs, Edward and Annette Salomon, owned the real estate located at 811 East Lake Front Drive, Beverly Shores, Indiana. The Salomons hired Mark Scott Construction, LLC, (MSC) to demolish the house on the property and to build a new house and retaining wall. They also hired architect Mark VonDerHeide to design their new home. VonDerHeide hired Soils and Structures, Inc. to perform engineering work on the property.

A large sand dune was located on the Salomon's property. To hold the sand dune in

1

place, VonDerHeide and Soils and Structures designed a retaining wall to sit behind the house and wrap around the sides of the house. The wall directly behind the house was designed to be 25 feet tall and was labeled on the engineering and architectural plans as a "Type B" wall. The plans called for shorter walls on the sides of the house and were described in the plans as "Type A" walls.

Soil & Structures provided VonDerHeide with their engineering drawings for the Type A and Type B walls. The drawings called for the Type B retaining wall to be constructed in terraced segments of three feet of rise to three feet of run. The face of each terraced segment included almost vertical 6x6 timbers cemented into the ground. The engineering plans also called for the Type B wall to be anchored to the ground by Manta Ray Anchors.

VonDerHeide's architectural plans for the Type B wall modified the engineering plan. His plan allowed for five feet of rise to two feet of run. The steeper walls designed by VonDerHeide would have been required to hold a greater load of lateral pressure than the wall designed by Soil & Structures.

When constructing the retaining walls, MSC used a design different from either that provided by VanDerHeide or Soil & Structures. Specifically, MSC did not use either the cemented vertical timbers or the Manta Ray Anchors called for in the designs. Instead, MSC used a system of crisscrossing timbers behind the retaining wall as a means of anchoring the wall. Mark Scott, the president of MSC, stated that he used this anchoring system rather than the one called for in the design because he believed it was in the best interest of the project after considering the sand dune, the trees, the neighbors, and the costs. Scott had used this design in the past and had found it in a book. He did not discuss using the crisscross timber anchoring

2

system with the Salomons or VonDerHeide prior to incorporating it into the timber retaining wall.

MSC used 6x6 timbers, concrete, and spikes to construct the timber retaining wall. None of the materials that went into the construction of the wall were defective, and the wall was built according to Scott's intended plan. After the timber retaining wall was completed, MSC built a temporary wall of plywood and timber between the timber retaining wall and the area where the house would sit. Scott admitted that the temporary wall was based on his own personal design.

After the permanent and temporary retaining walls were completed, a subcontractor hired by MSC began excavation work for the foundation of the home. On September 29, 2009, while the excavation work was in progress, the retaining wall shifted and bowed. The parties agree that the subcontractor performed its work according to the design.

At the time the retaining wall shifted and bowed, MSC had an insurance policy in place with the defendant, Cincinnati Insurance. The policy was comprised of three parts, including the "Builders' Risk Inland Marine Coverage Part", the "Installation Floater Special Coverage Part", and the "Commercial General Liability Coverage Part". The Salomons were listed as additional insureds under the Builders' Risk Coverage Form and Installation Floater Special Coverage. The Salomons requested that Cincinnati Insurance reimburse them for their costs and damages incurred in the repair and replacement of the retaining wall. Cincinnati denied their request.

The Salomons then filed suit against Scott, seeking damages for the repair of the retaining wall. Scott tendered the lawsuit to Cincinnati seeking a defense and indemnity under the CGL Policy. Cincinnati refused to provide Scott's defense and to reimburse him for the cost of repairing the retaining wall. The Salomons and Scott entered into a Settlement and

Assignment Agreement. The Salomons' claims against Scott were settled for $259,000, and the payment obligation of Scott to the Salomons was satisfied by the assignment of his rights, claims, and entitlements for defense and indemnity under the CGL Policy to the Salomons. The Salomons filed their complaint against Cincinnati Insurance on September 22, 2010.

Cincinnati retained an engineering firm to determine the cause of the wall's failure. Thomas Leahy, a structural engineer, examined the timber retaining wall after it shifted and bowed. Leahy reviewed the engineering plan, architectural plan, photographs, correspondence, and other documents related to the planning and construction of the timber wall and prepared an expert report. Leahy opined that the constructed walls differed significantly from the design. The design called for Type B walls unless it was noted that Type A walls should be used. The difference between the Type A and Type B walls was that the Type A walls omitted the embedded vertical post on the exterior face of the wall and the Manta Ray Anchors. The two wall types relied on different methods for their strength and stability. Type A walls depended on the weight of the interlocking timbers behind the wall and the weight and strength of the backfill to provide resistance to lateral forces. Type B walls depended on the embedment of vertical posts in front of the stacked timbers and anchorage of the Manta Ray. Upon inspection, Leahy found that the constructed walls were closer to Type A walls.

Leahy further noted that "the shift in the wall may also be attributed to possible settlement of backfill behind the wall and/or excavation of soil in front of the lower, temporary retaining wall at the base of the main retaining wall . . . If backfill was not placed and compacted properly, the stability of the crib-type wall would be greatly affected." (Leahy Aff. Ex. B p. 4) Leahy also acknowledged that excavation could have been a "contributing" factor. (Leahy Aff.

4

Ex. B p. 5)

On January 31, 2013, both parties filed a motion for summary judgment. Cincinnati Insurance attached an affidavit prepared by Leahy to its motion. In his affidavit, Leahy stated that excavation and inadequate backfill could have been contributing factors, but that the shift primarily was caused by errors, omissions, and defects in the design of the wall and that the excavation and backfill would not have been a factor except for the use of the crib-type system to anchor the wall. This is because the crib-type walls relied on the weight and strength of the backfill to provide resistance. The Salomons have moved to strike Leahy's affidavit as an untimely supplement to his expert report.

Discussion

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert to prepare a report containing "a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." The rules further direct an expert to supplement or correct his disclosures in a timely manner if the party learns that some material aspect of the response is incomplete or incorrect. **Rule 26(e).** Any additions or changes to an expert report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." **Rule 26(e).** However, a party may not sandbag information from its opponents by supplementing an expert report after discovery has been closed. *Allgood v. General Motors Corp*., 2007 WL 647496, *3 (S.D. Ind. Feb. 2, 2007).

An expert may submit an affidavit in support of a motion for summary judgment, but

5

generally the court will not consider new opinions set forth in the affidavit that were not disclosed prior to the date the motion was filed unless the new opinions are harmless or the submitting party offers a substantial justification for their untimely disclosure. ***Solaia Technology LLC v. ArvinMeritor, Inc.***, 361 F.Supp.2d 797, 806 (N.D. Ill. 2005). When determining whether an expert's supplemental affidavit should be excluded, the court first must ask whether the statements offered by the expert are new or contradictory opinions. ***Solaia Technology***, 361 F.Supp.2d at 807. If the opinions do not differ substantially from those offered earlier, they are not late for purposes of Rule 26(a), and there is no reason to exclude the opinions. ***Rowe International Corp. v. Ecast, Inc***., 586 F.Supp.2d 924, 935 (N.D. Ill. 2008). If it is determined that the statements differ substantially, the court then must ask whether the party seeking to introduce the statements offered a substantial justification for interjecting the new information at a late stage of the litigation. ***Solaia Technology***, 361 F.Supp.2d at 807.

In addition, a party resisting summary judgment may not "patch-up potentially damaging deposition testimony with a contradictory affidavit." ***Commercial Underwriters Insurance Company v. Aires Environmental Services, Ltd.***, 259 F.3d 792, 799 (7th Cir. 2001); *see also* ***Buckner v. Sam's Club, Inc***., 75 F.3d 290, 292 (7th Cir. 1996)("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict deposition or sworn testimony."). If a party intends to defeat summary judgment by offering testimony that contradicts a sworn statement, the party introducing the contradictory statement first must explain the contradiction or resolve the disparity. ***Cleveland v. Policy Mgt. Sys., Corp***., 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).

The Salomons argue that Leahy's affidavit is a supplement to his earlier report, sets forth

new theories and disposes of his old theories, and was untimely submitted. Cincinnati counters that Leahy's affidavit is not a supplement because it does not advance any new theories, and even if the court were to consider it as a supplement, it is not untimely because the parties' pretrial disclosures are not due yet.

In his expert report, Leahy devoted most of his opinion to explaining the differences in the construction of the retaining wall from the original plans. He then added that "[w]e believe the shift in the wall may also be attributed to possible settlement of backfill behind the wall and/or excavation of soil in front of the lower, temporary retaining wall on the base of the main retaining wall. Settlement of the sandy soil behind the wall could occur due to likely inadequate compaction of backfill and the heavy rains after construction of the wall was completed." (Leahy Aff. Ex. B p. 4) Leahy explained that if the backfill was not placed and compacted properly, the stability of the wall would be greatly affected. Leahy also concluded that "[e]xcavation in front of the temporary retaining wall at the bottom of the main wall could have been a contributing factor in the settlement and movement of the retaining wall." (Leahy Aff. Ex. B p. 5)

Leahy acknowledged that the excavation may have been a *contributing* factor, but he never stated that the excavation alone could have produced the damage to the wall. His theory that the excavation contributed to the destruction of the wall relied on what he considered to be the predominant cause, the improper construction of the retaining wall. There is nothing in his expert report to reflect that Leahy thought otherwise. Therefore, his clarification that the backfill was a condition, rather than cause, of the wall's damage and that the collapse would not have occurred but for the type of wall that was constructed is consistent with his conclusions in his

7

expert report.

Additionally, Leahy stated in his expert report that inadequate compaction of backfill and heavy rains could have affected the stability of the "crib-type wall". Leahy's expert report specifically mentioned the type of wall, highlighting that his opinion relied directly to the type of wall that was built. Leahy never stated that inadequate backfill could have affected the stability if the Type B wall called for in the design had been constructed. In fact, in his report Leahy explained that the constructed walls were similar to the Type A walls called for in the design, which relied on the adequacy of the backfill for their stability and strength, whereas the Type B walls derived their strength from anchors. Leahy elaborated on this in his affidavit, explaining that the compaction of backfill only would be an issue with the "crib-type" wall because this type of wall relied on the weight of the backfill for its strength and stability. In both documents, Leahy's opinion relied on the type of wall built as a necessary and predominate factor of the wall's collapse and, therefore, his affidavit did not introduce any new theories.

It never was Leahy's position that the excavation or backfill could have caused the damage but for the construction of the crib-type wall. For these reasons, the court does not find that Leahy was introducing new opinions in his affidavit, and his opinions are not late for purposes of Rule 26(a). *See **Rowe***, 586 F.Supp.2d at 935 (finding that expert's opinions were not late for purposes of Rule 26(a) because his affidavit did not introduce new or contradictory opinions). The Salomons' motion to strike is **DENIED**.

Both parties also moved for summary judgment, arguing that the provisions of the insurance policy dictate judgment in their favor. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to

any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 , 91 L. Ed. 2d 265 (1986); *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012); *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S. Ct. 1598, 1610, 26 L. Ed.2d 142, 155 (1970); *Stephens*, 569 F.3d at 786. A fact is material if it is outcome determinative under applicable law. There must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Stephens*, 569 F.3d at 786; *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). However, summary judgment may be entered against the non-moving party if it is unable to "establish the existence of an essential element to [the party's] case, and on which [that party] will bear the burden of proof at trial . . .". *Kidwell*, 679 F.3d at 964 (citing *Benuzzi v. Bd. of Educ*., 647 F.3d 652, 662 (7th Cir.2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under

9

> Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986).

*See also* **Reeves v. Sanderson Plumbing Prods., Inc**., 530 U.S. 133, 149-51, 120 S.Ct. 2097, 2109, 147 L. Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); *Celotex Corp*., 477 U.S. at 322-23, 106 S. Ct. at 2553; **Stephens**, 569 F.3d at 786; **Argyropoulos v. City of Alton**, 539 F.3d 724, 732 (7th Cir. 2008)(stating that a genuine issue is one on which a reasonable fact finder could find for the nonmoving party); **Springer v. Durflinger,** 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

The parties agree that Indiana law governs the interpretation of the terms of the policies because the contract was formed to insure a home in Indiana. *See* **Nautilus Ins. Co. v. Reuter**, 537 F.3d 733, 737 (7th Cir. 2008)(discussing that the law of the state with the most intimate contacts, which is assessed by considering the place of contracting, place of contract negotiation, place of performance, location of subject matter, and domicile or place of business of the parties, governs interpretation of the contract). Interpretation of an insurance policy is a question of law to be decided by the court. **National Fire and Casualty Company v. West**, 107 F.3d 531, 534 (7th Cir. 1997). Insurance policies are interpreted according to the same rules of construction as other contracts. **Barga v. Indiana Farmers Mut. Ins. Group, Inc**., 687 N.E.2d 575, 578 (Ind. App. 1997); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997). Words are given their plain and ordinary meaning, and ambiguities are to be resolved in favor of the insured. **Anderson v. State Farm Mut. Auto Ins. Co.**, 471 N.E.2d 1170, 1172 (Ind. App. 1984). When interpreting the

contract, the court favors a meaning that provides coverage to the insured. *West*, 107 F.3d at 535; *Barga*, 687 N.E.2d at 578.

The parties first dispute whether the Builder's Risk Policy provides coverage for the cost of repair and replacement of the retaining wall. The Builder's Risk Policy states in relevant part:

> We cover direct physical loss caused by a Covered Cause or Loss to buildings and structures described on the "declarations" while in the course of construction, erection, or fabrication. This includes materials and supplies which will become a permanent part of the buildings or structures, all while located on the premises of the buildings or structures described on the "declaration", or within 1,000 feet of the such premises. This includes foundations, excavations, grading and filling.

The Builder's Risk Policy does not define "in the course of". Cincinnati asks the court to read " in the course of construction" to extend coverage to an individual structure only at the time that specific structure is under construction. Although this is one way to interpret the plain terms of the contract, the provision also could be interpreted to provide coverage to the structures identified in the declarations that suffer physical damage while other construction on the property was ongoing. To determine the intended meaning, the court must consider the contract as a whole.

Within the same provision, the Builder's Risk Coverage Form extends coverage to materials and supplies on or within 1,000 feet of the property that will become a permanent part of the building or structure. The contract specifically identifies foundations, excavations, grading, and filling as covered property. Grading is the process of leveling off a sloping surface. It would be illogical to believe that the contract covered ground that had yet to be graded because at that point it would not be "grading" and no expense would have been incurred. Rather, the provision makes clear that completed grading that was affected by construction would be covered. The retaining wall, which certainly was intended to be permanent and was located on the property, was built to grade

11

the property so that the sand dune would not be disturbed and the house would be stable. The court sees little distinction between the ground work specifically named by this provision and the retaining wall, which was a necessary structure to keep the sand dune in place and provide stability to the home. It appears by the very terms of this provision, the retaining wall was covered by damage caused in the course of construction on the property.

The Builders' Risk Coverage Form also lists property that is not covered. Among the exclusions are existing buildings or structures to which additions, alterations, improvements, or repairs are being made. The contract does not exclude property damage to existing structures arising from construction on other parts of the property. Rather, it only excludes coverage to the existing structures that are being improved. If the wall was an "existing structure" listed in the document, it is not clear that damage to it caused by work done in the course of construction on another structure on the property would be excluded from coverage. *See* ***Exelon Generation Co., LLC v. Local 15, International Brotherhood of Electrical Workers,*** 676 F.3d 566, 571 (7th Cir. 2012)**;** ***Jerik v. Columbia Natl., Inc***., 1999 WL 1267702, *4 (N.D. Ill. Sept. 30, 1999) (explaining the maxim of expressio unius est exclusio alterius, which states that if certain provisions are identified in a contract, the parties intend to exclude other like provisions).

The provisions of the Builders' Risk Coverage Form suggest that coverage was intended for the retaining wall. However, the court's inquiry does not end there. The parties agree that the insurance policy consisted of three parts, including the Builder's Risk Policy, the CGL, and the Installation Floater Special Coverage. The CGL states that Cincinnati Insurance will pay the sums the insured becomes legally obligated to pay, but it excludes coverage for damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly

12

or indirectly on your behalf are performing operations if the 'property damage' arises out of those operations" (Pl.'s Mot. Summ. J. Ex. 4) "That particular part of real property . . . is not limited to the precise spot on real property where the contractor is performing operations at the moment the damage occurs. Rather the phrase is limited to the area where the contractor was hired to perform operations." (Pl.'s Mot. Summ. J. Ex. 4)

Cincinnati previously denied coverage under the CGL Policy because the wall, although completed, was within "the particular part of real property" on which the contractors were "performing operations". Now Cincinnati asserts that the retaining wall was completed and not "in the course of construction".

In support of their argument, the Salomons refer the court to *Bosecker v. Westfield*, 724 N.E.2d 241 (Ind. 2000). In *Bosecker*, the insurance policy defined "covered property" as "[b]uildings or structures including foundations while in the course of construction, installation, reconstruction or repair." Under a separate provision, the contract defined "Property Not Covered" as "[e]xisting buildings or structures to which improvements, alterations, repairs, or additions are being made". The court found the policy ambiguous, explaining that a structure was both covered and not covered if it was under repair. *Bosecker*, 724 N.E.2d at 243. The Salomons argue that the insurance policy at issue creates the same type of illusory coverage and must be construed to provide coverage.

Cincinnati argues that its denial of coverage under the CGL does not shed light on whether there is an ambiguity in the insurance policy because its duty to provide coverage depends on the facts as alleged in the complaint against the contractor. Because the Salomons alleged negligence by Scott, the lawsuit concerned activities Scott did while working on the property. Cincinnati also

argues that *Bosecher* is inapplicable because the Salomons have not demonstrated that the retaining wall was both covered and uncovered property within the meaning of the contract as did the plaintiffs in *Bosecher*.

Cincinnati asks the court to interpret the Builder's Risk Coverage Form to limit coverage only to structures that were being worked on at the time the damage occurred. Yet, under the CGL damage to the property that the contractors or subcontractors were working on either directly or indirectly was excluded from coverage if the damage arose out of that entity's work. Despite the Salomons' contention that this creates illusory coverage under Cincinnati's interpretation of the contract, the provisions leave some, albeit a narrow category of, damage that would be covered. Read together, property damage to structures the contractors were working on at the time the damage arose would be covered provided that the damage did not arise from the contractor or subcontractor's work. This is not a complete conflict as the one identified in *Bosecher* and does not demand that the court interpret the contract in favor of coverage.

The Salomons also ask the court to adopt the portion of the CGL which expands "that particular part of real property" beyond the precise spot where the contractors were working. However, the court is not willing to take that leap. The provision in the Builders' Risk Coverage Form limits coverage to the "buildings" and "structures" and does not state that it provides coverage for the property as a whole. If the provision in the Builders' Risk Coverage Form similarly referred to "that particular part of real property", the court would be more amenable to this argument. However, the difference in wording implies that the parties intended a different meaning.

Although the CGL does not create the type of ambiguity the Salomons contend, when considered as a whole, the court believes that the parties intended to create coverage for the retaining

14

wall in its state right before the collapse. First, the retaining wall still may have been "in the course of" construction. A temporary wall remained behind it as further support while the construction was ongoing, suggesting that the wall was not entirely finished because the temporary support had yet to be removed. The contract also provided coverage for grading, filling, and excavation that would become part of the permanent structure. Because the retaining wall was a permanent part of the grading that would help support the house, it appears to be covered under this provision. The policy also excluded certain types of damage to "existing structures", so even if the court were to consider the wall an existing structure as Cincinnati advances, it is not clear that damage caused by work on a new structure on the property resulting in damage to the "existing structure" is excluded. Moreover, the very fact that the provision is ambiguous supports an interpretation in favor of coverage. *Anderson,* 471 N.E.2d at 1172 (explaining that ambiguities should be resolved in favor of coverage). However, regardless of whether the retaining wall is "covered property", the Builder's Risk Coverage form excludes certain types of losses, which deprives the plaintiffs of coverage.

One of these exclusions is loss arising from "[d]esign, specification, construction or workmanship". The parties dispute whether Scott "designed" the retaining wall or whether his deviations from the architect and engineer's design was a "method" of construction. "Design" is not defined by the contract, but its ordinary meaning is "1. A plan or scheme. 2. Purpose or intention combined with a plan." *Black's Law Dictionary* 511 (9th Ed. 2009).

The Salomons hired an engineer and an architect to design the retaining wall. Their design called for four foot on center almost vertical posts across the face of each level of the wall, with each post cemented into the ground, and with each post anchored by a Manta Ray Anchor (an anchor driven deep into the sand dune). The wall constructed by MSC did not have four foot on center

15

vertical posts and was not anchored by Manta Ray Anchors. Instead, Scott used crisscrossing timbers to anchor the wall. The Salomons maintain that the difference between the constructed wall and the designs should be attributed to Scott's method of building the wall. The Salomons point out that Scott did not draw or write down his ideas. Scott also testified that the finished project was essentially the same as what the architect's design called for.

The court does not find Scott's failure to write down or draw out his plan dispositive of whether he "designed" the wall. In fact, later in his deposition Scott admitted that he designed the temporary retaining wall and that it was built according to the design he had developed in his mind and had not written down. Furthermore, Scott has not alleged that he was following the design given to him by the architect and that he erred in following it or could not follow it as written. Rather, he stated that "[b]ased on the conditions on the site, we felt it was really in the best interest to design– to build the walls as we did." (Scott Dep. p. 72) Scott also testified that he took into consideration the conditions of the dune, trees, neighbors, and cost. (Scott Dep. p. 72) This was not an oversight or failure to follow the plan precisely. By Scott's own admission, he considered multiple factors, intentionally rejected the design given to him, and purposely implemented an anchoring plan of his own. See *Black's Law Dictionary* 511 (9th Ed. 2009) (defining design as having a purpose or intention combined with a plan).

The undisputed evidence shows that neither the architect nor structural engineer designed the system that was used to anchor the wall, so the design must be attributable to someone. Scott testified that he chose the method based on information he saw in books. Although he did not invent the method he used, he intentionally applied it based on his survey of multiple conditions, and in doing so, he chose the design of the retaining wall. This was not a matter of using a wrong part or

16

improperly carrying out the plan. Rather, Scott employed an entirely different method to anchor the wall after careful consideration. The damage resulted from Scott's deliberate choice to deviate from the plans, not from his method of carrying out the plan given to him.

The Salomons further argue that a question of fact remains concerning whether the "inadequate design" caused the wall's collapse. The Salomons insist that Leahy postulated a number of possible causes, including settlement of backfill, excavation, and inadequacy of the lower temporary retaining wall. As explained above, Leahy did state that other factors could have contributed to the wall's damage, but the invariable factor in his opinion was the wall's design. It was Leahy's opinion that these additional conditions would not have contributed to the damage if the wall had not been built using the "crib-type" design. This is because the stability of the crib-type design relied on the earth surrounding it. The Salomons have submitted no evidence of their own to show that the damage could have been caused by these or other factors irrespective of the wall's design. The only evidence of record reflects that the design of the wall, whether individually or when combined with the additional contributing factors of excavation or inadequate backfill, caused the wall to fail.

The parties also dispute whether the Installation Floater Special Coverage Form creates coverage for the retaining wall. The Installation Coverage Form provides additional coverage for a collapse and states in relevant part "We will pay for the 'loss' caused by or resulting from risks of direct physical 'loss' involving collapse of all or part of a building or structure caused by one or more of the following . . . F. Use of defective materials or methods in construction, remodeling or renovation . . ." However, the Installation Floater Coverage also provides an exclusion similar to that in the Business Risk Coverage Form, for a loss resulting from inadequate or defective design.

17

For the same reasons stated above, the Salomons' argument must fail. Again, the undisputed evidence shows that the damage was caused by the design of the wall, not Scott's methods for carrying out the plans. It did not occur from Scott's failure to drive an anchor far enough into the dune or from inadequate spacing, rather, it resulted from Scott using an alternative method of securing the retaining wall that proved ineffective. The Salomons point to their complaint, which alleges that the damage was the failure of Scott and the excavation subcontractor to utilize proper materials and methods. However, at this stage the Salomons must do more than point to the unsupported allegations in their complaint, and they have failed to do so. *See **Anderson***, 106 S.Ct. at 2510, 477 U.S. at 249.

The parties next dispute whether coverage is excluded under the provision of the CGL which excludes: "'[p]roperty damage' to 'your work' arising out of it or any part of it. . . This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." The undisputed evidence supports only one conclusion – that the damage arose out of Scott's work and did not arise out of the work performed by Scott's subcontractor. Leahy acknowledged that inadequate back fill and excavation may have contributed to the wall's damage. However, his opinion concludes that the failure occurred because the wall was built in the crib-like style, rather than using anchors as called for in the design. The Salomons have not supplied their own expert or pointed to any other evidence to show that either the excavation or inadequate backfill were the cause of the damage or that Scott's design was not a necessary factor and the predominate reason for the wall's collapse. This failure is fatal to their case.

To conclude, the uncontradicted evidence shows that Scott intentionally deviated from the designs given to him and applied a different system for anchoring the retaining wall. Leahy's expert

18

report and affidavit are the only evidence explaining the cause of the retaining wall's damage. This uncontradicted evidence shows that although excavation and inadequate backfill may have contributed to the damage, it would not have happened but for the use of the crib-type anchoring Scott designed. Because the insurance policy excluded coverage for property damage caused by the design of the structure being constructed, the policy does not provide coverage for the damage that occurred.

Based on the foregoing, the Motion for Summary Judgment [DE 44] filed by the plaintiffs is **DENIED**; the Motion for Summary Judgment [DE 47] filed by Cincinnati Insurance is **GRANTED;** and the Motion to Strike [DE 50] is **DENIED.**

ENTERED this 20th day of June, 2013.

/s/ Andrew P. Rodovich

United States Magistrate Judge